**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JAMES H. HARRIS, CYNTHIA
EPTING, and JODY Q.
GARRISON, as Executor of the
Estate of Irma L. Herrin,

  Plaintiffs,

v.

FEDERAL DEPOSIT
INSURANCE CORP. as receiver
for COMMUNITY BANK &
TRUST, CHARLES M. MILLER,
WESS DODD, JAN GARRISON,
and RANDY JONES,

  Defendants.

CIVIL ACTION NO.
2:10-CV-00231-RWS

## **ORDER**

This case comes before the Court on Defendants Miller, Dodd, and Garrison's Motion for Summary Judgment [110]. After reviewing the record, the Court enters the following Order.

## **Background**

This action arises out of the alleged fraudulent conduct of Defendant Bank Officers in inducing Plaintiffs to take out loans to help prop up Cleveland Motor Cars, Inc. ("CMC"), a financially troubled car dealership in Cleveland,

Georgia. CMC had a long-standing relationship with Community Bank & Trust ("CBT") until CBT failed and the Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver.

By late 2008, CMC owed CBT approximately $6.5 million. That debt became unsecured when a security deed lapsed on real property that served as collateral for these loans. (Pls.' Statement of Add'l Material Facts ("SAMF"), Dkt. [113] ¶ 9.) Still, CBT honored CMC's checks as the overdrafts on CMC's checking account piled up to around $1.2 million. (Id. ¶ 18.) The overdraft fees amounted to thousands of dollars per day. (Id. ¶ 16.) Meanwhile, Mitchell Simpson, CMC's founder, and Defendant Randal Jones, CBT's Chief Credit Officer responsible for processing loans and collateral documentation, had daily conversations about CMC's overdrafts and plans to keep it afloat. (Id. ¶¶ 8, 14.)

At this time, Defendant Charles Miller was the Chief Executive Officer of CBT and was Defendant Jones's direct supervisor. (Id. ¶¶ 12, 15.) Defendant Wes Dodd was the Chief Financial Officer and Chairman of the Asset Liability Committee, and all loans over $50,000 were reported to him on a weekly basis. (Id. ¶ 13.) Defendant Jan Garrison was a Senior Vice President

2

and Chief Compliance Officer, and she was responsible for reporting all potential violations of banking laws and regulations to the CBT Board of Directors. (Id. ¶¶ 10-11.)

Throughout this period, CBT assured CMC that it was working on a solution. According to Simpson, "Jones repeatedly stated that he was working with Defendants Dodd and Miller to remedy the overdrafts with a consolidation loan." (Id. ¶ 19; Simpson Aff., Dkt. [116-13] ¶ 6.) The FDIC had also commenced an examination of CBT, and Simpson states that in August 2008 he received a call from Jones telling him they needed to correct the overdrafts to prepare for the examination. (Pls.' SAMF, Dkt. [113] ¶¶ 20-21; Simpson Aff., Dkt. [116-13] ¶¶ 7-8.) Jones asked Simpson to meet him at CBT the next day. (Id.) Simpson attended that meeting along with Plaintiff James Harris and others. Miller briefly stopped by, telling the attendees only that they "would get through everything and he would 'see us on the other side.' " (Simpson Aff., Dkt. [116-13] ¶ 8.)

While it would take some time to complete a consolidation loan, Jones devised a plan whereby it would make $200,000 loans to "Affiliated Borrowers"—business associates, friends, and family of Simpson—with the

3

proceeds going to CMC's accounts with CBT. (Pls.' SAMF, Dkt. [113] ¶ 23.) Jones assured the Affiliated Borrowers, including Plaintiff Harris, that they would not be responsible for the loans. (Id. ¶ 38.) In fact, Jones told Harris that CMC would make payments on the note, not him, and the note would be consolidated with a larger loan from CBT to CMC within ninety days. (Id.)

Simpson states that he and some of the Affiliated Borrowers went to CBT to execute the $200,000 loans around August 2008. (Simpson Aff., Dkt. [116-13] ¶ 12.) No Plaintiffs accompanied Simpson at this time. (Id.) Simpson went to Garrison's office to sign the loan paperwork. She did not advise them of any of the loan terms, but the documents were on her desk and she showed the Affiliated Borrowers where to sign. (Id.) Simpson believes Harris executed his loan separately either later that day or the next day. (Id. ¶ 14.)

In January 2009, Harris learned from CBT that the loan had not been consolidated and thus the loan made in his name would have to be renewed. (Pls.' SAMF, Dkt. [113] ¶ 42.) Harris signed the loan-renewal documents in Garrison's office, although he could not recall if she was present at the time. (Harris Depo., Dkt. [116-7] at 34-35.) In February 2009, Harris's note came due. Worried that he could be held in default, Harris made a payment on the

4

AO 72A
(Rev.8/82)

note. (Pls.' SAMF, Dkt. [113] ¶ 46.) CMC then reimbursed Harris for the payment he made on the note. (Id. ¶ 47.)

Plaintiffs also point to an October 23, 2008 e-mail from Michael Dunagan, a loan review officer, to Defendants Miller, Dodd, and Jones addressing the Affiliated-Borrower loans. (See Dunagan E-mail, Dkt. [116-13] at 39.) In this e-mail, Dunagan states that Garrison told him Miller and Dodd had approved some of these loans, but the e-mail does not specifically mention Plaintiffs' loans. (Id.)

In addition to the $200,000 Affiliated-Borrower loans, in early 2009 CBT and CMC got other individuals to assist CMC in purchasing used cars at auction by taking out $125,000 loans. (Pls.' SAMF, Dkt. [113] ¶ 70.) These Affiliated Borrowers included Plaintiffs Irma Herrin and Cynthia Epting. (Id.) As with the $200,000 loans, the $125,000 loans were to be taken out in individuals' names, but the proceeds were to be deposited into CMC's account with CBT. (Id. ¶ 72.) The $125,000 loans would also be consolidated into a single loan to CMC. (Id.) These loans were secured by titles to cars purchased at auction, and as the cars were sold, the notes were paid down. Garrison was involved in this process. (See E-mails Between Simpson and Garrison, Dkt. [116-13] at 46-

5

47.) In addition, Garrison signed loan files related to the $125,000 Affiliated-Borrower loans. (Pls.' SAMF, Dkt. [113] ¶ 90.)

Unlike the other Plaintiffs, Epting never had direct contact with Simpson or anyone from CBT. Rather, her son approached her about taking out a $125,000 Affiliated-Borrower loan, and she granted him permission to sign the loan documents on her behalf. (Id. ¶ 106.) Epting also received assurances from her son that she would not have to pay back the loan because CMC would be responsible. (Id. ¶ 108.) Garrison signed the documents in Epting's loan file. (Id. ¶ 114.) Despite Garrison's involvement in the loans, however, Epting testified that she did not know how the exchange of titles would work at the time the straw-borrower loans to Plaintiffs were made. (Defs.' Resp. to Pls.' SAMF, Dkt. [124] ¶ 117.)

Eventually, the CBT Board of Directors approved the $11 million consolidation loan. James Bruce, an Affiliated Borrower as well as business associate and father-in-law of Simpson, testified that he discussed the consolidation loan with Defendants Miller, Jones, and Garrison. (Pls.' SAMF, Dkt. [113] ¶ 127.)

6

On January 10, 2010, CBT failed, the Commissioner of the Georgia Department of Banking and Finance closed CBT, and the FDIC was appointed as receiver. (Id. ¶ 135.) The FDIC then pursued the Affiliated Borrowers to attempt to collect on the notes. (Id. ¶ 141.) Plaintiffs filed suit against the FDIC as receiver for CBT ("FDIC-R"), as well as Defendant Bank Officers Jones, Miller, Dodd, and Garrison. In response, the FDIC-R counterclaimed against Plaintiffs. Plaintiffs assert that they have been damaged by incurring attorney's fees, costs, and expenses in defending themselves against the FDIC-R's claims. In addition, Plaintiffs state that their credit histories have been damaged. Defendants Miller, Dodd, and Garrison move for summary judgment on Plaintiffs' remaining claims for fraud by omission and negligent misrepresentation.

## Discussion

### I. Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears 'the initial responsibility of informing the . . .

7

court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which

8

are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

## II. Analysis

### A. Negligent Misrepresentation (Count V)

To succeed on a claim for negligent misrepresentation under Georgia law, a claimant must show the following elements: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Next Century Commc'ns Corp. v. Ellis, 318 F.3d 1023, 1030 (11th Cir. 2003) (citation omitted). Essential to Plaintiffs' claim is a showing that Defendants

9

made a representation to them. See Ali v. Fleet Fin., Inc. of Ga., 500 S.E.2d 914, 915 (Ga. Ct. App. 1998).

Plaintiffs argue that Defendant Bank Officers negligently supplied Plaintiffs with false information that they would not be liable for the loans. Plaintiffs state that "[p]romises from Defendants Miller and Dodd were conveyed down to Mr. Harris through Mr. Jones and Mr. Simpson." (Pls.' Resp., Dkt. [112] at 24.) Plaintiffs also assert that "Ms. Garrison interacted directly with Ms. Herrin with respect to the loan in her name," and that "Ms. Garrison interacted directly with Mr. Simpson in the car-title-swap-out process," who in turn informed Plaintiffs Epting and Herrin that their loans "would be rolled up into a consolidation loan." (Id. at 25.) Moreover, Plaintiffs allege that "in the case of Mrs. Epting, the misinformation was passed through her son." (Id.) Plaintiffs argue that they need not show Defendants directly supplied Plaintiffs with false information.

Nevertheless, Plaintiffs are unable to produce evidence that Defendants made any direct or indirect representations to them, or that Defendants even knew about Jones's promises. Plaintiff Harris's testimony establishes that he interacted only with Jones before he executed his note. Harris was asked at his

10

deposition who else attended the meeting where Jones proposed that Harris and others take out $200,000 Affiliated-Borrower loans for the benefit of CMC:

> Q: Was anyone else present at that meeting [where the loan documents were drawn up] besides Mr. Bruce, Mr. Simpson, Mr. Jones and possibly Mr. Ken Turner?
>
> A: No.
>
> Q: So none of my clients, Mr. Miller, Mr. Dodd or Ms. Garrison were present at that meeting; correct?
>
> A: Correct.
>
> . . .
>
> Q: So the sole reason that you entered into this loan was based on the statements of Randy Jones at that meeting; correct?
>
> A: Correct.
>
> . . .
>
> A: [Defendant Jones is] the only bank officer I had any contact with.
>
> Q: So you only talked to Mr. Jones about these loans?
>
> A: Yes.

(Harris Depo., Dkt. [116-7] at 14, 16, 20.) Harris's deposition establishes that his decision to enter into the loan agreement was based entirely on

11

representations by Defendant Jones that Harris "wouldn't have to make any payments [on the loan], [and] it was going to be short term and it was going to be rolled over into a consolidation note with CMC." (Id. at 14.)

Furthermore, there is no evidence Jones acted at the direction of Dodd, Miller, or Garrison. Jones's deposition establishes that he could not remember ever conversing with Miller and Dodd about the $200,000 loans, or his representation to Plaintiffs that they would not have to pay the notes. (Dkt. [116-4] at 7.) At most, Defendants had knowledge the Affiliated-Borrower loans existed, but there is no evidence that they knew Jones told the Affiliated Borrowers that they would not have to repay them. While Dodd and Miller approved these loans, there is no evidence that they knew of Jones's promises because those oral agreements were not included in the terms of the loans.

In arguing that Defendants knew about the agreements, Plaintiffs cite Simpson's statement that he met with Jones and Miller about "turning CMC's debt into a working capital loan," and Miller told Simpson that "CBT would stand behind CMC no matter what." (Pls.' SAMF, Dkt. [113] ¶ 21.) Plaintiffs also point to how Miller and Dodd "really liked" a business plan presented in January 2009 that would make CMC profitable and encompassed the

12

consolidation of Plaintiffs' loans. (Id. ¶¶ 44.) But Plaintiffs do not establish how liking the plan constituted a misrepresentation, or how Harris could have relied on such statements. Indeed, this meeting took place several months after Harris met with Defendant Jones and initially took out his affiliated loan.

Plaintiffs next emphasize that because Defendants knew of CMC's financial difficulties and overdrafts on its account, and because the $200,000 loans were used to cover the overdrafts, "[a] reasonable inference exists that the Officer Defendants used these notes to hide the true nature of CBT's relationship with CMC from the FDIC. There is no question that the Officer Defendants knew about these loans and how these loans were being used." (Pls.' Resp., Dkt. [112] at 16.) Yet even assuming that Miller and Dodd were generally aware both of CMC's financial problems and the Affiliated-Borrower loans, that fact does not establish that Miller or Dodd directly or indirectly supplied false assurances to Harris that he would not be liable for the loans, or that they even knew of Jones's promises.[1] The Court cannot find evidence in the record to support the inference that Defendants must have known of Jones's

---

[1] Additionally, "a failure to obtain and supply information does not state a claim for negligent misrepresentation." Futch v. Lowndes County, 676 S.E.2d 892, 896 (Ga. Ct. App. 2009).

13

representations simply because the Affiliated-Borrower loans were taken out.

Nor have Plaintiffs shown that Garrison made misrepresentations to Harris about his $200,000 loan. Plaintiffs argue that she supplied the loan documents for some borrowers, but there is no evidence she was present for the execution of Harris's loan. Plaintiffs cite the statement in the October 23, 2008 e-mail that Garrison told Dunagan that Miller and Dodd had approved certain $200,000 loans, but again, this evidence is insufficient to show that Garrison or anyone besides Jones offered false assurances to Plaintiffs.

With respect to the $125,000 loans to Plaintiffs Epting and Herrin, Jones was insistent that Miller and Dodd had no knowledge of Jones's promise that Plaintiffs would not have to pay back the loans:

> Q: And I'll tell you, you know, this Miller and Dodd using you. They're trying to use you as a scapegoat, and I'm giving you an opportunity to say that that's not correct, that they knew about these $125,000 loans.
>
> [Jones]: Well, I know exactly where you're going . . . I don't think I'm the scapegoat. I mean, I did it. I did it, and when I did it, Charlie [Miller] and Wes [Dodd] had no knowledge of it.

(Jones Depo., Dkt. [110-3] at 15-16.) Jones further testified that Garrison was not present for any conversion between him and Simpson about the

14

arrangement for the Affiliated-Borrower notes. (Id. at 17-18.) And even if Miller and Dodd approved these loans, there is nothing suspect about the loan documents themselves that would indicate Jones made misrepresentations. Rather, Defendants would have seen language in Plaintiffs' loan documents such as: "The Debtor acknowledges that this is the entire agreement between the parties . . . . The Debtor expressly agrees to all of the provisions of this Agreement and signifies assent by the signature(s) below." (Epting Security Agreement, Dkt. [110-10] at 11.) Herrin's security agreement expressly stated, "There are no unwritten oral agreements between the parties." (Herrin Security Agreement, Dkt. [110-12] at 6.) And the promissory notes contained language such as: "the undersigned Borrower promises to pay the principal amount, together with interest, and any other charges . . . to the order of the Lender at its office." (Epting Promissory Note, Dkt. [110-9] at 2.)

Moreover, Epting's deposition establishes that she never relied on any representations made by Miller, Dodd, or Garrison. (See Epting Depo., Dkt. [110-5] at 46 ("Q: Did you ever rely on any statements by Mr. Miller, Mr. Dodd, or Ms. Garrison? A: I never talked directly to them, no. Q: So you never relied on any statements by them? A: No.")) Plaintiff Herrin states that she

15

was told to go to CBT and to meet with Garrison. (Herrin Aff., Dkt. [116-16].)[2]
At the meeting with Garrison, Herrin states that Garrison "did not tell me anything about the documents I was signing, or even that such documents would ever be considered a 'loan' to me. . . . At no time did [Garrison] tell me of a payment obligation, an interest rate, how to make payments, or other payment terms."[3] (Id. ¶¶ 7-8.) However, Herrin produces no evidence that either Miller, Dodd, or Garrison made any false representations to her.

For the above reasons, Plaintiffs have failed to produce evidence that Defendants made any misrepresentations to Plaintiffs upon which they relied in executing their loans. Nor is there evidence that Defendants knew of Jones's promises. And contrary to Plaintiffs' arguments, there is no genuine issue of material fact about whether Defendants negligently supplied false information to Plaintiffs just because Defendants had general knowledge of the loans.

---

[2]Defendants object to Plaintiffs' use of the Herrin Affidavit and certain depositions taken in related litigation, see FDIC v. Cleveland Motor Cars, Inc., No. 2:09-CV-0151-RWS, to which Defendants were not parties. (See Defs.' Reply, Dkt. [123] at 4 n.1; 12-13.) Because the Court finds that these documents fail to create a material factual dispute, the Court does not address Defendants' arguments that they should be excluded.

[3]The Court notes that Herrin's promissory note includes payment terms. (See Herrin Promissory Note, Dkt. [110-11].)

16

Accordingly, Miller, Dodd, and Garrison are entitled to summary judgment on Plaintiffs' negligent misrepresentation claim.

### B. Fraud by Silence or Omission (Count III)

Plaintiffs next allege that Defendant Bank Officers committed fraud by failing to inform Plaintiffs of allegedly wrongful banking practices that had taken place.[4] Under Georgia law, a claim for fraud has five elements: "(1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." Home Depot of U.S.A., Inc. v. Wabash Nat'l Corp., 724 S.E.2d 53, 60 (Ga. Ct. App. 2012). "Fraud is not committed by wilful misrepresentation alone but in this regard 'is subtle and can be accomplished in an infinite number of ways including signs and tricks and even, in some instances, by silence." Infinity Ins. Co. v. Martin, 624 S.E.2d 294, 296 (Ga. Ct. App. 1999) (quoting Stanford v. Otto Niederer & Sons, Inc., 341 S.E.2d 892, 894 (Ga. Ct. App. 1986)). "Except in plain and indisputable cases, questions of fraud and whether a plaintiff could have protected himself through

---

[4]The Court previously dismissed Plaintiffs' fraud claim based on affirmative conduct. (See Aug. 1, 2012 Order, Dkt. [68] at 16.)

17

the exercise of ordinary diligence are . . . for a jury." Lester v. Bird, 408 S.E.2d 147, 150 (Ga. Ct. App. 1991).

According to Plaintiffs, questions of fact exist regarding "the degree of [Defendants'] knowledge and involvement in the fraudulent conduct and the failure to inform the defrauded party of the material facts." (Pls.' Resp., Dkt. [112] at 15.) As the Court found above, there is no evidence that Miller, Dodd, and Garrison knew of Jones's promises to Plaintiffs when Plaintiffs took out the loans. Even so, Plaintiffs argue that once Defendants learned of Jones's misrepresentations, they "did not seek to inform Mr. Harris that he could be deemed responsible on the loan should either CMC or CBT fail." (Id. at 17.) Plaintiffs further argue that Garrison "knew CMC would fail and was artificially propped up by CBT, but did not inform Plaintiffs of the dangers associated with the impending failure." (Id. at 19.)

However, even though Defendants later found out about Jones's conduct, the Court finds that their failure to inform Plaintiffs about these dangers does not amount to fraudulent concealment. Plaintiffs do not show how Defendants' alleged fraudulent omission was intended to induce Plaintiffs to act or refrain from acting. If Defendants had informed Plaintiffs that Jones's representations

18

were false, Plaintiffs still would have been liable for the loans according to the terms of the notes. Finally, the Court notes that Plaintiffs' loan documents contained merger clauses, undercutting their argument that their reliance on any alleged fraud was reasonable. See *supra* Part II.A. Plaintiffs thus fail to establish a factual issue with respect to Defendants' intent to induce Plaintiffs to act or not to act, or with Plaintiffs' reliance on the alleged omissions. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' fraud by omission claim.

## Conclusion

For the foregoing reasons, Defendants Miller, Dodd, and Garrison's Motion for Summary Judgment [110] is **GRANTED**.

**SO ORDERED**, this  30th  day of September, 2014.

**RICHARD W. STORY**
United States District Judge

19